IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 1:19-CR-152-1 |
| | ) | |
| DAVID FRANCIS CLARK, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM AND OPINION ORDER

Catherine C. Eagles, District Judge.

The defendant-inmate, David Clark, asks for reconsideration of the denial of his motion for compassionate release, made pursuant to 18 U.S.C. § 3582(c)(1)(A). Reconsideration is appropriate in view of the strong and unrebutted evidence about the dangerous conditions at FCI Ashland. But while Mr. Clark has shown extraordinary and compelling circumstances, balancing those circumstances against the § 3553(a) factors establishes that a sentence reduction is not warranted. The motion for reconsideration is granted, but the underlying motion for sentence reduction will again be denied, after full and complete reconsideration.

### I. Procedural Overview

In 2019, Mr. Clark pled guilty to one count of possession with intent to distribute cocaine hydrochloride. Minute Entry 05/08/2019; Doc. 14. On August 20, 2019, the Court sentenced Mr. Clark to 162 months of imprisonment, followed by three years of supervised release. Minute Entry 08/20/2019; Doc. 25.

On May 22, 2020, Mr. Clark, through counsel, filed a motion for compassionate release pursuant to 18 U.S.C. § 3582(c)(1)(A), asking the Court to reduce his sentence based on chronic medical conditions and the risk of complication posed by the COVID-19 virus. Doc. 35. The Court denied the motion because his chronic conditions were well-controlled and because the § 3553(a) factors indicated that a sentence reduction would be inappropriate in light of his continued danger to the community and the lengthy amount of time left on his sentence. *See* Doc. 45 at 4–5.

On December 8, 2020, Mr. Clark moved for reconsideration of the Court's denial.[1] Doc. 50. Mr. Clark is housed at FCI Ashland, where he contends that the BoP has not provided adequate medical care for his chronic asthma, hypertension, or lack of a spleen since he tested positive for the COVID-19 virus in November 2020. *See* Doc. 50 at 1–2. The Court allowed Mr. Clark to submit supplemental pleadings and other evidence to develop the record. *See* Docs. 52, 54, 55, 59. The government has responded, Docs. 64–65, and Mr. Clark filed a reply brief with additional evidence. *See* Doc. 70.

## II. Evidence Considerations related to Compassionate Release Motions

### A. Generally

---

[1] Mr. Clark noticed his appeal of another order that denied an unrelated § 2255 motion to vacate, set, aside, or correct sentence. *See* Doc. 60. Because the pending motion for reconsideration is unrelated to the matter on appeal, the Court retains jurisdiction to decide the § 3582(c)(1)(A) motion. *See* 16A Charles Alan Wright & Arthur R. Miller, *Fed. Prac. & Proc.* § 3949.1 n.53 (5th ed. 2020) (explaining that a notice of appeal only restricts district court action as to "the matters that are comprehended within the appeal").

Affidavits and declarations under penalty of perjury are always appropriate to consider in connection with sentencing decisions. But the evidentiary standard is relaxed in sentencing matters, and a district court may consider relevant information without regard to its admissibility under the Federal Rules of Evidence.[2] The Fourth Circuit has repeatedly allowed sentencing courts to consider "any relevant information before it, including uncorroborated hearsay, provided that the information has sufficient indicia of reliability to support its accuracy."[3] "There are generally no limitations on the types of character and background information a court may consider" when it comes to assessing pertinent sentencing factors.[4] Courts routinely consider, for example, letters from family members and employers, school records, letters or statements by victims, police reports, and similar documentary information.

This relaxed standard applies to motions for sentence reduction pursuant to § 3582(c)(1)(A). The standard is specifically set forth in the Sentencing Guidelines,

---

[2] *See United States v. Hernandez-Villanueva*, 473 F.3d 118, 122 (4th Cir. 2007); U.S.S.G. § 6A1.3(a) (stating that for sentencing determinations, "the court may consider relevant information without regard to its admissibility under the rules of evidence"); Fed. R. Evid. 1101(d)(3) (providing that the Federal Rules of Evidence are inapplicable to "miscellaneous proceedings such as: . . . sentencing; granting or revoking probation or supervised release; and considering whether to release on bail or otherwise.").

[3] *United States v. Powell*, 650 F.3d 388, 392 (4th Cir. 2011) (quoting *United States v. Wilkinson*, 590 F.3d 259, 269 (4th Cir. 2010) and collecting cases).

[4] *United States v. Chambers*, 956 F.3d 667, 674–75 (4th Cir. 2020) (citing 18 U.S.C. § 3661); *see*, *e.g.*, *United States v. Walls*, No. 2:12-CR-00173, 2020 WL 6390597, at *4 n.3 (W.D. Pa. Nov. 2, 2020) (considering a handwritten letter from a compassionate-release applicant after the government failed to respond).

3

which Congress contemplated would provide guidance for these motions,[5] and there is no reason to think this flexibility should not apply to compassionate release motions.

In all post-conviction matters related to sentencing decisions,[6] courts are entitled to rely on the facts adopted in the presentence report.[7] Courts often rely on other reliable information provided by the probation office about the defendant's conduct while incarcerated, such as education courses completed, disciplinary infractions, payments towards court-ordered fees or restitution, and work assignments,[8] and on suggestions from the probation office about the suitability of a defendant's release plan and any additional conditions of supervised release.[9] Other records maintained by the Bureau of Prisons are appropriately considered, such as a defendant's medical records,[10] subject to

---

[5] *See* § 3582(c)(1)(A) (requiring that a sentence reduction be "consistent with applicable policy statements").

[6] In addition to compassionate release motions filed by the BoP or a defendant, these proceedings can include re-sentencings after direct appeal, partially successful § 2255 motions, retroactive changes to the sentencing guidelines, and § 404 motions under the First Step Act.

[7] While the Fourth Circuit did not specifically cite the presentence report in *United States v. McCoy*, it discussed facts underlying the defendants' cases, their ages, and their criminal records, all information normally in the PSR. 981 F.3d 271, 279 (4th Cir. 2020); *see also Powell*, 650 F.3d at 394 (noting the presumption of reliability for evidence in presentence reports).

[8] *See, e.g.*, *McCoy v. United States*, Crim. No. 2:03-cr-197, 2020 WL 2738225, at *3 (E.D. Va. May 26, 2020), *aff'd*, 981 F.3d 271 (4th Cir. 2020); *United States v. Royster*, No. 1:14-CR-427, 2020 WL 7392801, at *2 (M.D.N.C. Dec. 10, 2020); *United States v. Williams*, No. 1:13-CR-370-4, 2020 WL 5097490, at *2 (M.D.N.C. Aug. 28, 2020).

[9] *See, e.g.*, *United States v. Dilworth*, 1:04-CR-412, 2021 WL 861495, at *4 (M.D.N.C. Mar. 8, 2021) (noting the defendant's excellent release plan approved by USPO); *Williams*, 2020 WL 5097490, at *3–4 (imposing additional conditions on release and mandating compliance).

[10] *See, e.g.*, *United States v. Flenory*, No. 20-1767, 2021 WL 510247, at *1 (6th Cir. Feb. 11, 2021) (relying on BoP medical records to affirm the denial of a compassionate release).

questions over whether they are complete or accurate.  And letters from family members can be considered, just as they would be during original sentencing proceedings.

### B.  Considerations Arising During the Pandemic

When considering compassionate release motions based in part on circumstances related to the pandemic, courts have tended to be even more flexible on evidentiary standards.  This is appropriate, given the time-sensitive nature of these motions and the constraints imposed by the pandemic itself on the more traditional ways parties develop, support, and rebut factual claims.

For example, there is an understandable tendency in normal times to take unsworn and uncorroborated statements made by a *pro se* litigant in a post-conviction motion with a grain of salt.  But courts understand it is often impossible during the pandemic for a *pro se* inmate or even an attorney to obtain declarations, letters from family members, a family member's medical records, or reports from experts, or to develop and present other corroborating evidence within the time frame usually required for these motions.  When a party makes factual assertions about matters within their knowledge, as is customary in a *pro se* motion or brief, or when a defendant's lawyer, who is an officer of the court, relays statements by their incarcerated client or other identified witnesses, courts can and should consider such statements, giving them appropriate weight

5

depending on the other evidence and circumstances.[11]   But this only goes so far, and courts may still be wary of giving weight to unsupported statements in a brief made by counsel without personal knowledge or some other indicia of reliability, especially when counsel's source of facts is not identified.

As another example, courts have traditionally and appropriately been careful about whether to consider matters reported on the internet, since the internet is a notorious source of inaccurate and even false information.  But during the pandemic, courts routinely consider as evidence the latest guidance from the Center for Disease Control, as made available on the CDC website, especially when there is no objection.[12]  There is often no time to develop and present expert testimony, and the peer-reviewed papers about the virus have been few and far between, and perhaps even outdated by the time they are published.  Under these circumstances, relying on CDC guidance is appropriate.

COVID-19 infection numbers posted on the Bureau of Prisons website are also commonly considered as a minimum number of confirmed cases,[13] though there are often

---

[11] *See Powell*, 650 F.3d at 392 (allowing sentencing courts to consider uncorroborated hearsay and any information with sufficient indicia of reliability).

[12] *United States v. Harris*, 989 F.3d 908, 912–13 (11th Cir. 2021); *United States v. Kelley*, 488 F. Supp. 3d 444, 448 (S.D.W. Va. 2020) (collecting cases); *see also United States v. Elias*, 984 F.3d 516, 520 (6th Cir. 2021) (approving the district court's reliance on CDC guidance); *see also United States v. Kibble*, No. 20-7009, 2021 WL 1216543, at *5 n.1 (4th Cir. Apr. 1, 2021) Gregory, C.J., concurring) (noting the reliance of all parties "upon the expert, albeit evolving, guidance provided" by the CDC).

[13] *See, e.g.*, *United States v. Godfrey*, Case No. 10-30049, 2021 WL 1041682, at *1 (C.D. Ill. Mar. 18, 2021); *United States v. Kosic*, 18 Cr. 30(PAC), 2021 WL 1026498, at *3 (S.D.N.Y. Mar. 17, 2021); *United States v. Grubb*, Crim. No. 5:16-CR-00011-KDB-DCK-1, 2021 WL

questions raised as to whether the BoP's testing procedures were sufficient to identify all, or even most, positive cases. It seems likely that the vaccination numbers the BoP is now posting on its website will be considered,[14] unless and until they prove to be suspect.

Many compassionate release motions filed during the pandemic raise issues about whether and to what extent the BoP is taking reasonable steps to reduce the spread of the virus among inmates and staff and whether the BoP is providing appropriate medical care for chronic conditions during the pandemic. The BoP has control of this evidence since the witnesses are its own employees. When a defendant-inmate makes factual assertions about issues like bad hygiene, lack of quarantining, inmate movement, or lack of medical care during the pandemic and the government does not produce evidence within its control to rebut those claims, this failure can raise an inference that the evidence would support the defendant's factual assertions.[15] It is a factor to take into account.

The same is true when the BoP affirmatively denies inmates access to the evidence it controls or otherwise interferes with the defendant's ability to develop the factual

---

111486, at *2 (W.D.N.C. Jan. 12, 2021); *United States v. Carter*, 1:06CR100-1, 2021 WL 54092, at *2 (M.D.N.C. Jan. 6, 2021).

[14] *See, e.g.*, *United States v. Dinehdeal*, 3:16-CR-30107-RAL, 2021 WL 1116386, at *5 (D.S.D. Mar. 24, 2021) (noting the BoP's new vaccination program); *United States v. English*, 2:19-CR-20164, 2021 WL 267774, at *3 (E.D. Mich. Jan. 27, 2021) (same).

[15] *See, e.g.*, *Vodusek v. Bayliner Marine Corp.*, 71 F.3d 148, 156 (4th Cir. 1995) ("The mere failure, without more, to produce evidence that naturally would have elucidated a fact at issue permits an inference that the party fears to produce the evidence." (cleaned up)).

7

record.[16]  Incarcerated persons do not lose their constitutional rights to meaningful access to the courts just because they are in prison.[17]

Finally, the Court has substantial concerns about giving much weight to statements on the BoP website about precautions the BoP is taking to prevent the spread of disease, for several reasons.  First, the assertions are usually not attributable to a specific person who is accountable for inaccuracies.  Second, the assertions are not easily confirmed; they are unlike the number of cases in a particular prison, which can ultimately be confirmed or refuted by underlying medical records.  Third, the assertions are often generic and are not specific to conditions in a particular prison.  And finally, the number of positive cases of staff and inmates that the BoP itself provides can, when high enough, undermine these self-serving assertions.  If the government wants to present evidence about what is being done to minimize the spread of disease or provide medical care in a particular prison, there is no reason it cannot file a copy of a declaration under oath.

## C. Application of Evidentiary Considerations

In connection with Mr. Clark's compassionate release motion, his attorney scheduled a call with him through his BoP case manager for January 7, 2021.  Doc. 65-1 at 4.  On the day of the call, the case manager took an extended sick leave.  Doc. 65-2.

---

[16] *See Silvestri v. Gen. Motors Corp*, 271 F.3d 583, 590 (4th Cir. 2001) (noting the Court's inherent power to preserve the integrity of the judicial process in the event of spoliation).

[17] *Lewis v. Casey*, 518 U.S. 343, 346 (1996); *Bounds v. Smith*, 430 U.S. 817, 821–22 (1977); *see also Ching v. Lewis*, 895 F.2d 608, 610 (9th Cir. 1990) ("[A] prisoner's right of access to the courts includes contact visitation with his counsel."); *Boyd v. Anderson*, 265 F. Supp. 2d 952, 969 (N.D. Ind. 2003) ("The right to consult with an attorney survives incarceration . . . .").

8

No one informed Mr. Clark or his attorney, *see* Doc. 54 at 1–2, and no one else at the BoP took responsibility for providing Mr. Clark with access to his attorney. Despite his counsel's repeated efforts to arrange a new call, nothing happened for almost three weeks until the case manager returned to work. Doc. 65-1 at 1.[18] It is fair to say that the BoP interfered with Mr. Clark's timely presentation of his time-sensitive compassionate release claim to the courts. *See Lewis*, 518 U.S. at 346.

In dealing with this problem, the Court specifically informed the government that it might consider Mr. Clark's assertions about his conditions of confinement as true if the government did not submit testimony under oath from a witness with personal knowledge directed towards the interference with Mr. Clark's right to counsel. Doc. 57 at 1. In response, the government did not submit any testimony under penalty of perjury, *see* Docs. 64–65, though it did submit some emails, Doc. 65-1, and an unsigned, typewritten assertion of facts not attributed to any person. Doc. 65-2. Even if this evidence is considered, as it has been in the recitation of facts herein, it only shows that the BoP's obstruction of Mr. Clark's access to counsel was negligent, not intentional; it does not establish that the BoP has taken seriously Mr. Clark's right to consult with counsel about time-sensitive matters. Indeed, it affirmatively shows the opposite.

The government has not submitted any evidence itself about the conditions of confinement at FCI Ashland. Mr. Clark raised those conditions in his December 8 motion, Doc. 50 at 2, and the government's response was not due until over a month

---

[18] It should go without saying that Mr. Clark does not have unrestricted access to a telephone or a computer and that without BoP's involvement, he cannot freely communicate with counsel.

9

Case 1:19-cr-00152-CCE   Document 76   Filed 04/05/21   Page 9 of 17

later.  *See* Doc. 57.  The government identified three named officials from FCI Ashland that it "expects" would be available for testimony at a hypothetical hearing, Doc. 64 at 6 n.2, but it did not submit declarations from these officials or other knowledgeable witnesses nor any other sort of reliable information about the conditions at FCI Ashland.

On these facts, the Court will draw the inference that any evidence the government would submit about the conditions of confinement at FCI Ashland would support Mr. Clark's factual claims.[19]

The government has made factual assertions in its brief about steps the BoP is taking to contain the virus.  *See* Doc. 64 at 6–7.  While the Court has no reason to doubt that someone at the BoP made statements to an assistant U.S. Attorney that support counsel's representations, under these circumstances it would be unfair to consider those statements.  Whoever made the statements is unidentified and is not accountable in any way for their assertions.  The statements are not otherwise corroborated, and neither is the unsubstantiated assertion that FCI Ashland has implemented the BoP's Modified Operations Plan.  Doc. 64 at 5 (citing *BOP Modified Operations*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited Apr. 1, 2021)).  The BoP has shown it is not treating Mr. Clark's legal rights with serious attention, which raises questions about whether unidentified persons at the BoP are being careful to be accurate in their statements to the U.S. Attorney.

---

[19] "It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur." *Lewis*, 518 U.S. at 349.

10

Case 1:19-cr-00152-CCE   Document 76   Filed 04/05/21   Page 10 of 17

Mr. Clark's assertions about the conditions of his confinement are not inherently unbelievable and do not otherwise raise concerns about their reliability; indeed, he is saying the same things that many other inmates say in their motions for compassionate release and that more courts than can be cited have found as facts about at least some of the BoP's facilities at some points during the pandemic. The BoP has interfered with Mr. Clark's ability to present his claim in a more traditional evidentiary form by failing to provide timely and reasonable access to counsel in a time-sensitive manner, and the government has not provided any evidence to contradict Mr. Clark's assertions. The Court therefore accepts Mr. Clark's statements about the conditions of confinement at FCI Ashland as true.

### III. Facts and Analysis

#### A. Extraordinarily and Compelling Circumstances

Mr. Clark has two chronic medical conditions that, according to the CDC, "might" increase the risk of severe illness from COVID-19: asthma and hypertension.[20] He takes medication for his blood pressure, has two inhalers for his asthma, and is also on statins for his cholesterol. Doc. 55-1 at 26–27. His hemoglobin numbers show he is at increased risk of diabetes, Doc. 55-1 at 31, a well-known risk factor for severe illness

---

[20] *See People with Certain Medical Conditions*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/need-extra-precautions/people-with-medical-conditions.html (last visited Apr. 1, 2021).

11

from Covid-19. *See supra* note 20. His medical records show regular medical care and attention for these conditions, despite the pandemic. *See generally* Doc. 55-1.

It is undisputed that Mr. Clark does not have a spleen. *See* Doc. 19 at ¶ 61;[21] Doc. 50 at 2. He has not submitted any evidence related to his lack of spleen and a lay review of his medical records does not indicate any related health problems. *See* Doc. 55-1 at 21. But it is common knowledge that the spleen supports the immune system, and the CDC does say that other conditions that compromise the immune system either do or might increase a person's risk of severe illness from COVID-19. *See supra* note 20.

Mr. Clark tested positive for COVID-19 on November 19, 2020. Doc. 55-1 at 4. His medical records confirm he experienced shortness of breath for several weeks. *Id.* at 1, 4. He increased his use of his inhaler, and two rounds of steroids did not relieve his symptoms. Doc. 65-4 at 1–2; Doc. 70-3 at 2.[22] He is still experiencing some COVID-like symptoms, including shortness of breath after exertion, inflammation in his chest, and loss of taste and smell. Doc. 54 at p. 3 ¶ 8; Doc. 59 at p. 2 ¶¶ 10–11. There is no evidence that any other treatment was available but not prescribed.

Mr. Clark shares a dormitory-style housing unit with up to 118 other men and without any social distancing policy. Doc. 54 at 2. Many inmates exhibit untreated

---

[21] The Court adopted the presentence report with limited changes not relevant here. Doc. 26.

[22] Inexplicably, despite these ongoing symptoms that are confirmed by BoP medical records, Doc. 55-1 at 1 (showing he had shortness of breath on December 9), the BoP marked Mr. Clark's COVID case as "resolved" on December 12, 2020. *Id.* at 21.

12

COVID symptoms and are shuffled between other sections of the prison without first being quarantined. *Id*. at 2–3.[23] Guards move freely between the different security sections at the prison, often without masks. *Id*. at 4. The showers and ventilation system are all shared. *Id*. Prison officials often provide inmates with frozen meals without a way to reheat the food. *Id*. at 4–5.[24] Because officials have closed the commissary, inmates cannot buy pandemic necessities, like hand sanitizer, shampoo, or soap, and items needed for self-care, like Tylenol. *Id*.

The number of cases at Ashland has been high: at least one-third of all inmates have had COVID-19. In the past year at Ashland, the BoP says that some 325 inmates and 67 staff members have tested positive for COVID-19, and six inmates have died from the virus. *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/ (last visited Apr. 2, 2021); *FCI Ashland,* FED. BUREAU OF PRISONS, https://www.bop.gov/locations/institutions/ash/ (last visited Apr. 2, 2021) (showing a population of 959 inmates). Perhaps officials at Ashland have learned from experience, as fortunately recent reports show that positive cases are coming down. *See COVID-19 Coronavirus*, FED. BUREAU OF PRISONS, https://www.bop.gov/coronavirus/

---

[23] Mr. Clark says that inmates who test positive are never re-tested to confirm that they are no longer contagious. Doc. 54 at 2. But the CDC does not recommend retesting adults previously diagnosed with symptomatic COVID-19 within 90 days from the first onset of symptoms. *See Interim Guidance on Duration of Isolation and Precautions for Adults with COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited Apr. 1, 2021).

[24] Mr. Clark submits affidavits from inmates describing conditions at FCI Lompoc in California. *See* Doc. 70-2 at 3–6. This evidence provides some support for Mr. Clark's contention that the BoP is generally mismanaging the pandemic, but it is only marginally relevant to the specific risk Mr. Clark faces at Ashland.

(last visited Apr. 2, 2021) (showing zero inmate cases, three staff cases). If the BoP website is accurate, the facility has now fully vaccinated 120 staff and 100 inmates. *Id*.

According to the CDC, Mr. Clark faces a risk of reinfection, even though it is difficult to quantify. "The risk of reinfection . . . depends on the likelihood of re-exposure to infectious cases of COVID-19," and "[c]ontinued widespread transmission makes it more likely that reinfections will occur." *See COVID-19*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/hcp/duration-isolation.html (last visited Apr. 2, 2021). Additionally, "waning immunity and the possibility of exposure to virus variants" make the probability of reinfection increase with time after recovery from an initial infection. *Id*. Mr. Clark's risk is heightened because he is incarcerated in a congregate living setting. *See FAQs for Correctional and Detention Facilities*, CDC, https://www.cdc.gov/coronavirus/2019-ncov/community/correction-detention/faq.html (last visited Apr. 2, 2021) ("Staff and people incarcerated in correctional and detention facilities are at greater risk" for COVID-19); *see also* Doc. 70-1 at ¶¶ 10–15 (describing reinfection risk posed by prison congregate settings).

Though it cannot be quantified, the risk to Mr. Clark is real. He remains vulnerable to re-infection, he has two risk factors for severe illness from Covid-19, and his lack of a spleen and on-the-verge-of-diabetes diagnosis also may increase his risk. His risk is also increased by the BoP's demonstrated inability to follow basic safety precautions, such as confirming inmates and staff are not infectious before they move around the prison. The conditions of confinement have been extremely difficult for the last year, with the closure of the commissary, the limited access to basic hygiene items

like soap, poor food options, and constant worry about exposure to a virus that has killed hundreds of thousands of people. His access to the outside world through telephone calls has been so limited as to be almost non-existent during the pandemic, as the evidence about his inability to communicate with his lawyer shows.

Considering all of the evidence, Mr. Clark has established extraordinary and compelling circumstances warranting a sentence reduction.

### B. The § 3553(a) Factors

While the evidence of extraordinary and compelling circumstances is very strong, that is not the end of the inquiry. The Court must consider whether a sentence reduction is appropriate in light of any applicable § 3553(a) factors. *United States v. Kibble*, No. 20-7009, 2021 WL 1216543, at *4 (4th Cir. Apr. 1, 2021). It is appropriate to weigh those factors in light of the circumstances warranting relief.

The § 3553(a) factors have barely changed since the Court's last analysis. When the Court denied Mr. Clark's previous motion, some eight months ago and before his COVID diagnosis, he had served less than a year of his very lengthy sentence. *See* Doc. 45. The circumstances of his last eight months of incarceration have been exceptionally difficult, but he has still barely made a dent in his well-deserved sentence. And as the Court noted then and repeats now, his criminal history and the nature and circumstances of his offense show that he remains a danger to the community. *Id.* at 5.

Mr. Clark's risk of severe illness is real, but it appears to be a risk that is slowly receding, and it poses "only hypothetical or potential harm." *United States v. Beck*, No. 1:13-CR-186-5, 2021 WL 260402, at *4 (M.D.N.C. Jan. 26, 2021). BoP officials at

15

Ashland may not have responded well to the surge of management and health difficulties the pandemic presented, and their failures to quarantine and test allowed the disease to spread more readily, but Mr. Clark did receive appropriate treatment for COVID-19 once he was diagnosed. There is nothing in the record to indicate that he would receive better or different health care for his medical conditions if he were released.

Mr. Clark contends that the Court should change its evaluation of the § 3553(a) factors because his recent infection makes it less likely he will engage in future criminal conduct, especially if placed on home confinement. *See* Doc. 50 at 4–5. But typical deterrents to recidivism have been ineffective for him in the past. He is a career offender, Doc. 19 at ¶ 20, with a long history of violent firearms offenses, *id.* at ¶¶ 27–28, 30, and selling illegal drugs. *Id.* at ¶¶ 30–34. He has served several substantial prison terms. *Id*. at ¶ 27 (served some 8 years of 15-year sentence); ¶ 30 (20 to 24 months); ¶ 33 (35 to 42 months); ¶ 34 (11 to 14 months). He was well into his 40's and on state probation when he committed the instant crime, *see id.* at ¶ 36, which involved significant amounts of heroin, cocaine base, and cocaine hydrochloride. *Id*. at ¶¶ 6, 9. And the fact remains that he has served only a little more than two years of his 162-month sentence.

A sentence reduction would not promote respect for the law nor reflect the seriousness of Mr. Clark's crimes. *See* 18 U.S.C. § 3553(a)(2)(A). Balancing the § 3553(a) factors against the risk of severe complications that Mr. Clark faces from COVID-19, the Court again concludes, in its discretion and for the same reasons previously stated, *see* Doc. 45 at 4–5, that the sentencing factors overall do not favor a sentence reduction.

16

It is **ORDERED** that the defendant's motion for reconsideration, Doc. 50, is **GRANTED**, but the motion for sentence reduction, Doc. 35, is again **DENIED**.

This the 5th day of April, 2021.

_____
UNITED STATES DISTRICT JUDGE